UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Case No. 2:25-cr-15 |
| ) | |
| JOHNNY THIEL BANKS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S POSITION ON SENTENCING AND**
**OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT**

Being somewhere at the wrong time can have serious and life-altering consequences. Johnny Banks knows that better than most; throughout his life, being somewhere at the wrong time has landed him in trouble. When he was in the Eighth Grade, Johnny was studying in the library when another class's teacher accused him of stealing something out of her purse. Despite having done nothing but mind his own business, Johnny was removed from the library and forced to empty his pockets and remove his socks and shoes before the teacher found the missing item back in her classroom. He was embarrassed and humiliated in front of his classmates, just for being somewhere at the wrong time.

Years later, in 2019, Johnny was struck by a stray bullet, a random and arbitrary act of violence. Because he was somewhere at the wrong time, he was seriously injured and had to undergo major surgery. To this day, he suffers from complications, including severe nerve damage, pain, and the inability to move his left toes.

And if Johnny hadn't stopped at a gas station one night in June 2024, he never would have met the two young women who were involved in prostitution and looking to buy marijuana. This time, Johnny is not blameless for what followed. But it is no less true that this chance encounter— one he did not seek out or set in motion—is ultimately what led to him standing before this Court

1

for sentencing, facing the possibility of decades in prison. Johnny had no knowledge of or interest in commercial sex or "pimping" before that night, but he now has been convicted of sex-trafficking a minor, a nearly unthinkable crime.

In deciding the appropriate sentence for Mr. Banks, this Court must think about the nature and circumstances of this offense, including Mr. Banks's role and the impact on Jane Doe, the minor involved. But it also must consider Mr. Banks's tragic history and his positive characteristics, among the other sentencing factors. There is no question that the minor victim in this case was failed by the adults in her life, at every turn. But not all of her trauma can be laid at Mr. Banks's feet. On that basis, and for the reasons below, Johnny Thiel Banks respectfully asks this Court to impose a sentence of 18 years' imprisonment and 5 years of supervised release.

The requested sentence is a downward variance from the advisory Sentencing Guidelines range, which Probation has calculated to be life imprisonment. The defense has several objections to the Presentence Investigation Report (PSR), two of which would lower the guidelines range to 360–life if either were to be sustained.

## Sentencing Law

The Court must "impose a sentence that is sufficient, but not greater than necessary," to comply with the purposes of sentencing. 18 U.S.C. § 3553(a). In arriving at that sentence, it must consider the nature and circumstances of the offense and the history and characteristics of the defendant, the purposes of sentencing, the kinds of sentences available, the Sentencing Guidelines and any pertinent policy statements, the need to avoid unwarranted disparities among similarly situated defendants, and the need for restitution. *Id.*

Importantly, the "guidelines and policy statements set forth throughout the Guidelines Manual represent the first step in the sentencing process and are one of multiple factors judges

must consider under" the law. *See* U.S.S.G. Ch.1, Pt.A, intro. comment. (2025); *see also Gall v. United States*, 552 U.S. 38, 49–51 (2007). Sentences must be tethered to the § 3553(a) factors, not the advisory guidelines range; sentencing outside the guidelines range should be normal.

During this analysis, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; *see* 18 U.S.C. § 3661; *Concepcion v. United States*, 597 U.S. 481, 493–94 (2022) (listing statutory limitations). The government bears the burden of proving relevant facts and the applicability of sentencing enhancements by a preponderance of the evidence. *United States v. Harvey*, 532 F.3d 326, 337 (4th Cir. 2008); *United States v. Kiulin*, 360 F.3d 456, 460 (4th Cir. 2004).

## Objections to the PSR

The defense notes four objections to the PSR, two of which could affect the advisory guidelines range. Granting either or both of the objections to paragraphs 22 and 27 would reduce Mr. Banks's adjusted offense level to 42, reducing his guidelines range from life to 360–life. *See* U.S.S.G. Ch.5, Pt.A; PSR ¶¶ 44–50.

<u>First</u>, to remain consistent with Mr. Banks's not-guilty plea, the defense objects to portions of the offense conduct section of the PSR: paragraphs 4, 5, 8, 13, and 17. These objections have no impact on the guidelines range and are detailed in the PSR. Generally, the defense maintains that Mr. Banks testified truthfully at trial. The defense further maintains that not all Jane Doe's statements during the investigation of this case were true, particularly as they relate to Mr. Banks's conduct towards her on their final trip to Virginia. There is no evidence that corroborates her claims that Mr. Banks entered her residence with a gun, hit or strangled her, or put something in the drugs she took that made her fall asleep. Instead, text messages show that Jane Doe willingly went to

Virginia, and asked Mr. Banks to wait for her. *See* Exh. A (portion of Gov Trial Exhibit 5a-3). In addition, investigators and Virginia Beach police officers did not note or document any visible injuries during the overnight investigation following Jane Doe's detention.

Second, the defense objects to the application of § 2G1.3(b)(2)(B) for unduly influencing a minor to engage in prohibited sexual conduct, a two-level enhancement. PSR ¶ 22. This enhancement applies only if "a participant's influence over the minor compromised the voluntariness of the minor's behavior." U.S.S.G. § 2G1.3, comment. (n.3). If the participant is at least 10 years older than the minor, there is a presumption that the enhancement applies. *Id.*



---

[1] The government likely will point to other text messages which it believes show Mr. Banks threatening Jane Doe with violence. Even if so construed, proving a threat is not the same as proving a threat overbore a person's will and made their subsequent conduct involuntary. Viewed

4

███████████████████████████████████████████

███████

To the extent the Court disagrees and concludes Mr. Banks coerced Jane Doe, compromising the voluntariness of her behavior, § 2G1.3(b)(2)(B) constitutes double counting in conjunction with the base offense level set by § 2G1.3(a)(1) for 18 U.S.C. § 1591(b)(1) convictions. That increased base offense level already punishes the use of force, threats of force, fraud, or coercion, and a cumulative enhancement—while permissible under the law of this circuit—unfairly and artificially inflates Mr. Banks's guidelines in a manner that is inconsistent with the purposes of sentencing. A life sentence is well beyond what is necessary in this case.

<u>Third</u>, the defense objects to the application of § 3C1.1 for obstruction of justice, a two-level enhancement. PSR ¶ 27. This enhancement covers willful conduct related to the offense of conviction, any relevant conduct, or a closely related offense. U.S.S.G. § 3C1.1. The guidelines commentary explain that the enhancement is not meant to apply to providing a false name or false information to law enforcement officers, "except where such conduct actually resulted in a significant hindrance to the investigation or prosecution…." *Id.* comment. (n.5). Further, the defendant is accountable for his own conduct and for "conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused." *Id.* comment. (n.9). Separately, the Supreme Court has held the enhancement may apply based on a defendant's trial testimony only when such testimony rises to the level of perjury, defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

---

as a whole, the documented communications between the parties in this case shows Jane Doe's relevant conduct was at all times voluntary.

Here, in light of the commentary, the enhancement should not apply to Mr. Banks based on either his initial interaction with law enforcement or the alleged incident in which a third party contacted Jane Doe's mother and offered to pay her if she stopped supporting the prosecution. The former did not significantly hinder the investigation of the instant offense; indeed, at the time, no investigation of sex trafficking was underway. The latter allegedly involved conduct by a third party that Mr. Banks did not command, request, or encourage. In fact, the government provided no evidence that he knew about that contact until he was informed of it for trial preparation purposes. Nor should the enhancement apply based on Mr. Banks's testimony, which the defense maintains was truthful as to all material matters and was not contradicted by any credible evidence.

<u>Fourth</u>, the defense objects to the application of § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense, an enhancement to level 18 for Count Six. PSR ¶ 39. This objection would not impact the guidelines range because, whether or not it applies, the impacted offense group remains more than nine levels below the offense group with the highest offense level and, thus, does not impact Mr. Banks's adjusted offense level. U.S.S.G. § 3D1.4(c).

The guidelines commentary explains that the applicability of this enhancement depends on "the relationship between the instant offense and the other offense[.]" U.S.S.G. § 2K2.1, comment. (n.14). It applies only when "the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." *Id.* The Fourth Circuit has interpreted this language to be satisfied when the firearm had "some purpose or effect with respect to the other offense," such as "for protection or to embolden the actor." *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2020) (quoting *United States v. Jenkins*, 566 F.3d 160, 162 (4th Cir. 2009)).

Here, the firearm was located in the pocket of a pair of red shorts in the vehicle the minor was found in. Security footage shows Mr. Banks wearing those shorts earlier that evening, but he

6

was never observed directly with the firearm, and no evidence other than Jane Doe's statements suggests he brandished the firearm at any point during this offense. Even by her account, Mr. Banks frequently left the gun off his person and in the vehicle, and when issues arose about payment, the gun never was a factor in resolving those conflicts.

## Mr. Banks's History and Characteristics

Mr. Banks's history is characterized by unimaginable loss, but also great potential. Johnny Thiel Banks was born to Natasha "Tasha" Banks and Johnnie Thiel, Jr. His parents were not married, and they each had children with other partners. Before Johnny turned one, Ms. Banks relinquished custody of him to his paternal aunt, Tyra Smith, after Johnny suffered a series of "serious accidents" while Tasha was at work. *See* Exh. C, at 2–3 (combined support letters). These accidents included being fed inappropriate food, requiring emergency medical treatment, and a fall that required staples and stitches to Johnny's head. *Id.* Tyra was 22 at the time, and she took Johnny from New Orleans to live with her in North Charleston, South Carolina. To this day, Johnny refers to Tyra as his mother—the woman who raised him.

When Johnny was 3 or 4 years old, Mrs. Smith, now married to Kaon Smith, moved the family to Carthage, Mississippi. Throughout Johnny's childhood, his biological father kept in touch and stayed a part of his life, calling and visiting regularly, but Ms. Banks kept her distance. Tragically, Mr. Thiel was murdered in New Orleans in 2002, when Johnny was 7 years old. It was a random shooting, possibly a robbery gone wrong, and it was never solved. The loss of his dad devastated Johnny, but in hindsight, it was only the beginning. Mr. Thiel's death prompted Ms. Banks to reach out and rekindle her relationship with her son, which helped ease Johnny's grief, even as it prompted difficult questions about why she had kept her other children but not him. Within a year, just seven days after Johnny's eighth birthday, Ms. Banks passed away from cancer.

7

At her funeral, Johnny met his maternal grandmother, and she similarly began to build a relationship with him, only to pass away four months later.

Loss, after loss, after loss. For a child, losing one parent is traumatic; losing both is shattering. To Johnny, it must have seemed like the world was out to get him, stealing away his loved ones almost as soon as he met them. He had no control over the relationships in his life, and no respite from his grief. Compounding this trauma was the fact that no one he knew could truly relate to what he was going through. No one who still had a parent could understand him. He began acting out in school, and he found it difficult to form close friendships. Later, when Mr. and Mrs. Smith had their own children, Johnny struggled even more with feelings of isolation. He loves his cousins, but simply by existing, they reminded him that they had parents and he did not.

When Johnny was in middle school, his family moved back to Charleston. Living in a city was different than the countryside, but the change in scenery did little to help Johnny's inner struggles. While there is no question his aunt and uncle loved and supported him, they struggled to understand each other. Johnny needed to talk, but he had no one to talk to because no one understood him. Instead, his adolescence was characterized by transactional discipline, physical punishment, and few heart-to-heart chats. He learned to keep things to himself and that mistakes meant consequences—because you did X, we'll do Y to you, and you can't do Z. In high school, he had to quit football due to being punished and having to stay home so frequently.

To those who have gotten close to Mr. Banks, he is a kind and caring friend who goes the extra mile for those who need help. One of his tattoos, "My Brother's Keeper," reflects his commitment to those who are his "brothers"—not just by blood, but closer. He explains that he'll always be there for his brothers and have their backs, whatever they need. One of his closest friends, Lightskin, was Mr. Banks's "brother." They met in county jail when Mr. Banks was 17,

8

after Mr. Banks was arrested for entering a residence without consent. *See* PSR ¶ 53. They were cellmates for 13 months and served 3 years together at the same facility, heading home one month apart from each other. They bonded over shared experiences, but also shared loss: Lightskin's mother had died by suicide when he was a child, and his father had put him out onto the street rather than raise him. Mr. Banks and Lightskin grew so close that, the first day Mr. Banks was home, Lightskin showed up at Mrs. Smith's house to greet him. Having no other home, he stayed with the family, even after Mr. Banks moved out. And when Lightskin and his girlfriend had a daughter, Mr. Banks became her godfather—a relationship he proudly maintains. Sadly, Lightskin was murdered at his workplace two months after the birth of his daughter. Another loss Mr. Banks has had to make sense of.

    In spite of his trauma, Mr. Banks has always made opportunities for himself and found success on his own path. Those who know Mr. Banks uniformly note his intelligence and resourcefulness. While he struggled in school for disciplinary reasons, he never struggled with the material. He was placed in gifted classes in middle school. Around the same time, he began learning mechanical skills from his paternal grandfather during summer visits to his grandparents' home in Charleston. While Mr. Banks never intended to pursue a career in that area, his experience helped him quickly master home-renovation trades as a young adult. He started out working for others, but once he realized he needed little help or supervision, he left to start his own businesses and take home more of the proceeds from his labor. Soon, he was making more money than he knew what to do with. Mr. Banks's gifts will serve him well however he chooses to apply himself, and he fully intends to participate in programming during his sentence and return to society equipped for success.

Mr. Banks also has the support of his family, as is evident from the numerous letters of support written on his behalf. *See* Exh. C. His network will ensure he remains both grounded and accountable for his progress and past mistakes.

### The Nature and Circumstances of the Offense

The defense does not seek to minimize the offense conduct in this case, which is very serious. In weighing the nature and circumstances of this offense, however, the Court should also consider what Mr. Banks was going through at the time, and it should keep in mind what this offense was not.

Last summer, Mr. Banks was in a bad place, both mentally and financially. Mr. Banks's work had led him to move to Charlotte, where people had more money and spent it more easily. While he always found time to help his friends and family with renovations, often for little or no charge, he also began working for investors who were buying houses in up-and-coming areas on the border of North Carolina and Virginia and renovating them for a profit. He would spend weeks at a time on the road, working jobs mostly by himself, in areas like Corapeake, North Carolina—a town so small it's hardly on the map. This work was highly profitable, but Mr. Banks grew unmoored, and he began spending money as fast as he was making it, sometimes even faster. He was paying for his own apartment and others', making promises of his time and money, and struggling to keep everything together.

In early 2024, Mr. Banks started falling behind. He began missing payments, he found himself struggling to pay for tools he needed for his work, and he even lost his apartment. Worse, his renovating work began slowing down, and he worried that he might not have a job in another few months. His pride and instinct to keep others at arms' length prevented him from asking for

help. It was around this time, when he was at his lowest, that he met Jane Doe and ScooB at a gas station and stumbled onto the path that led him before this Court for sentencing.

Critically, Mr. Banks knew he could not continue going like he was. The day before his arrest, he told his aunt that once he was done in Virginia, he would return home and "get his life back on track." Exh. C, at 4. One must hope he would not have continued down the same path after taking some time to reflect and refocus his priorities. Mr. Banks sincerely regrets not returning home sooner.

None of this excuses Mr. Banks's conduct. Still, it is important to consider with clear eyes what that conduct was, and what it was not. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He did not have a sexual relationship with Jane Doe. The evidence does not support that he ever used violence against her or brandished his firearm.[2] And the duration of this offense can be measured in weeks, rather than months or years. These factors set this case apart from other sex-trafficking cases, all of which are horrific but not all of which are equally deserving of extreme sentences for those involved.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] Regarding the firearm, it is not surprising that someone who had been the victim of a random shooting and who regularly worked in rural areas where snakes are common possessed a firearm for protection.



Finally, it bears emphasis that this offense was an aberration for Mr. Banks. He has a criminal history, but it does not include any other offenses that are similar in kind or magnitude to this one. Neither does it show a progression or worsening trajectory, such that this offense was foreseeable. Instead, it shows an initial brush with the law at age 17, a handful of minor traffic, drug, and firearm-possession offenses, and a heat-of-the-moment assault. Despite Mr. Banks being classified in Criminal History Category V, it is not reasonable to fear that he would commit similar conduct if freed today, let alone many years in the future.

### The Purposes of Sentencing

A sentence of 18 years' imprisonment followed by 5 years of supervised release reflects the seriousness of the offense, promotes respect for the law, achieves just punishment, and affords adequate deterrence. Even a few years in prison is a serious limitation on liberty that significantly impacts a person's life going forward; 18 years is long enough to send a clear message, to Mr. Banks and others, that any form of sex trafficking causes great harm and will not be tolerated.

Regarding the need to protect the public, a lengthy sentence is not necessary to prevent Mr. Banks from recidivating. Again, this conduct was the result of an unfortunate alignment of circumstances that will never repeat, and even if they do, the requested sentence and the associated years of growth and maturity will be sufficient to ensure Mr. Banks enters such a situation primed to reject the path of criminality. Indeed, as discussed above, there are signs that he was already preparing to take a step back and switch paths when he was apprehended by police.

A key part of Mr. Banks's rehabilitation will be mental health treatment. Already in pretrial custody, Mr. Banks has benefitted from such treatment. At the Virginia Beach City Jail, he received weekly counseling sessions, and he reports it was a positive experience that helped him begin processing his trauma and coming to terms with his actions. Mr. Banks previously received counseling as a teenager related to his conduct in school, but at the time, he could not connect with the counselors and was not ready to engage with discussions about his trauma. With the benefit of age and maturity, he is more introspective and better able to express himself. Continued mental health treatment is critical to addressing the root causes of this offense, and the early indications should give the Court confidence that Mr. Banks will engage with the process and work hard towards rehabilitation.

Finally, when Mr. Banks completes his incarceration, he will be a much different person, reentering society under much different conditions than he has ever known. He will have to register as a sex offender, and every aspect of his life will be impacted by the conditions of supervised release that apply to sex offenders. As a person required to register, he will never really be free. Between the punishment and the passage of time that even the mandatory minimum sentence requires, and the strict rails of supervised release, Mr. Banks will be specifically deterred.

### The Need to Avoid Unwarranted Sentencing Disparities

This offense, while serious and deserving of punishment, does not deserve life or near-life imprisonment. Spanning only a few weeks, with one alleged victim whom Mr. Banks ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ it is far from the worst conduct others have committed and received a lesser sentence for under the sex-trafficking statutes.

For example, in *United States v. Omel Mclean*, No. 2:21-cr-50 (E.D. Va.), the defendant trafficked multiple minors for at least eight years. *See Mclean*, ECF No. 59, at 4–6 (gov't position

13

on sentencing). He recruited his codefendant when she was a minor, later manipulating her into becoming his accomplice. He controlled a revolving group of women and girls using manipulation and the infliction of physical violence with a baseball bat and paddles. He made his victims watch his abuse. He would "reward" his victims with illegal drugs. He commonly required the minors he recruited to first have sex with him, and he maintained sexual relationships with them, impregnating at least one. And he was heavily involved in taking and posting photos for commercial sex advertisements for his victims. For all this abhorrent conduct, the defendants' advisory guidelines range was life, even after a three-point reduction for acceptance of responsibility. *Id.* at 2–3. Yet the government requested, and this Court imposed, a sentence of 30 years' imprisonment. *Id.* at 1; *Mclean*, ECF No. 64 (amended judgment). Even viewed in the most unfavorable light, Mr. Banks's conduct is miles below the conduct in *Mclean* in terms of scope, duration, and turpitude.

In more comparable cases, courts have imposed lower sentences. In *United States v. Chapman*, No. 1:13-cr-298 (E.D. Va.), a jury convicted the defendant of three counts: conspiracy to commit sex trafficking of a child, sex trafficking of a child, and interstate transportation of a minor for purposes of prostitution. *Chapman*, ECF No. 59 (verdict). According to the government, evidence at trial showed that the defendant trafficked a 15-year-old girl. *Chapman*, ECF No. 64 (gov't position on sentencing). The defendant and her codefendant instructed the minor "how to have sex with strangers, they encouraged her to have sex without a condom, they arranged for her to meet with multiple strangers to have sex, they posted sexually suggestive photographs of her online, and they used the money earned by the victim to pay for a place for them to stay." *Id.* The victim testified that when she told the defendant she had been raped, "the defendant was unmoved and simply told her that she should not feel gross and encouraged the victim to continue to be a

14

prostitute." *Id.* In addition to the 15-year-old victim in the case, the defendant posted prostitution advertisements for other women, including other girls. *Id.* The applicable guideline range was 235–293 months, and the government requested a sentence within the guideline range. *See id.* The Court imposed concurrent sentences of 132 months of imprisonment on each count—eleven years total. *Chapman*, ECF No. 70 (judgment).

Likewise, in *United States v. Jefferies,* No. 1:12-cr-143 (E.D. Va.), the Court sentenced the defendant to 120 months, less than half the guidelines range of 292–365 months. *Jefferies*, ECF No. 47 (judgment). The defendant was a member of the Crips who participated in a sophisticated sex trafficking conspiracy that involved multiple minor victims. *Jefferies*, ECF No. 42 (gov't position on sentencing). He helped prostitute two 17-year-old female juveniles over a two-month period, posting advertisements, purchasing and providing condoms, renting hotel rooms, serving as a bodyguard while the victims went door to door in hotels and apartment buildings to solicit customers, and sharing in the profits. *Id.* at 1–4. In *United States v. Ghile,* No. 1:12-cr-182 (E.D. Va.), the Court sentenced another defendant in that case to 120 months when the guideline range was 188–235 months. *Ghile*, ECF No. 72 (judgment). Similar to *Jefferies,* the defendant participated in a sex-trafficking conspiracy over ten months and trafficked two 17-year-old female juveniles, transporting them and their customers, having sex with them during their "tryouts," and sharing in the profits. *Ghile*, ECF No. 69 (gov't position on sentencing).

While these cases are each distinguishable from this one, the criminal conduct involved is more in line with what Mr. Banks has been convicted of: a brief period of prostitution, limited coercion and little or no use of force, and one or, regarding the Crip conspiracy, two victims. Both the sentences ultimately imposed and the courts' willingness to vary below the guidelines ranges

15

counsel against rigid adherence to the guidelines range in this case. A lengthy sentence risks an unwarranted sentencing disparity, and a life sentence is sure to create one.

## Conclusion

This offense should never have happened, and the young woman involved should never have been exposed to this lifestyle. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ While undoubtedly serious, his conduct does not merit many decades in prison. This Court should recognize that Mr. Banks has experienced significant trauma and, last summer, he was struggling to get his life back on track. This offense is not who he is. A sentence of 18 years' imprisonment followed by 5 years of supervised release is sufficient, but not greater than necessary in this case.

Respectfully submitted,

JOHNNY THIEL BANKS

By:_____/s/_____
Keith Loren Kimball
VSB No. 31046
Supervisory Ass't Federal Public Defender
Virginia M. Bare
Member of the Maryland Bar
Assistant Federal Public Defender
Office of the Federal Public Defender
Attorneys for Johnny Thiel Banks
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: (757) 457-0800
Telefax: (757) 457-0880
Email: keith_kimball@fd.org
ginnie_bare@fd.org

## **CERTIFICATE OF SERVICE**

I certify that on this 12th day of November, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

And I hereby certify that I will send the document by electronic mail to:

Stephanie E. Hollier
United States Probation Officer
827 Diligence Drive, Suite 201
Newport News, Virginia 23606
Email Address --- stephanie_hollier@vaep.uscourts.gov

Respectfully submitted,

JOHNNY THIEL BANKS

/s/
Keith Loren Kimball
VSB No. 31046
Supervisory Ass't Federal Public Defender
Virginia M. Bare
Member of the Maryland Bar
Assistant Federal Public Defender
Attorneys for Johnny Thiel Banks
Office of the Federal Public Defender
500 E. Main Street, Suite 500
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax: 757-457-0880
Email: keith_kimball@fd.org
ginnie_bare@fd.org

17